PLUMBERS & STEAMFITTERS
LOCAL 598, Plaintiffs,

v.

John MORRIS et. al., Defendants.

No. C-76-171.

United States District Court,
E. D. Washington.

April 9, 1981.

Hafer, Cassidy & Price and Helsell, Fetterman, Martin, Todd & Hokanson, Seattle, Wash., for plaintiffs.

Ronald K. Mullin, Layman, Mullin & Etter, Winston, Cashatt, Repsold, McNichols, Connelly & Driscoll, Spokane, Wash., for defendant Bovee & Crail.

Davis, Wright, Todd, Riese & Jones, Seattle, Wash., for defendant Jones Const.

Phillip H. Ginsberg, Houghton, Cluck, Coughlin & Riley, Seattle, Wash., Richard Q. Quigley, Daniel C. Rooney, Richland, Wash., for defendants Doe and WPPSS.

Oles, Morrison, Rinker, Stanislaw & Ashbaugh, Seattle, Wash., for defendants Morris and Plmbg. & Mech.

Bogle & Gates, Seattle, Wash., for defendant Bechtel Power Corp.

Perkins, Coie, Stone, Olsen & Williams, Seattle, Wash., for Burns & Roe, Inc.

MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT WASHINGTON PUBLIC POWER SUPPLY SYSTEM'S MOTION TO DISMISS AND DEFENDANT'S JOHN MORRIS, MCA, BECHTEL, J. A. JONES, BURNS & ROE, BOVEE & CRAIL AND WPPSS' MOTIONS FOR SUMMARY JUDGMENT.

QUACKENBUSH, District Judge.

Plaintiffs are a labor union and its employees. They maintain that Defendants are liable for damages due to a course of conduct that allegedly violated the Sherman Act §§ 1 and 2. For this, Plaintiffs invoke the remedies of treble damages and injunction pursuant to 15 U.S.C. §§ 15 and 26. The Court assumed jurisdiction over the case under these statutes and 28 U.S.C. § 1337.

This case is set in the area of the nuclear power facility construction ongoing at Hanford in eastern Washington. Washington Public Power Supply System (WPPSS), a defendant, owns and operates one of the relevant nuclear plant sites at Hanford. The other relevant site is owned and operated by the U. S. Department of Energy (formerly ERDA), not a party.

Local Union 598 (Local), a Plaintiff, is an affiliate of the United Association of Journeymen and Apprentices, AFL–CIO (UA). Local's primary business is to represent plumbing and pipefitting employees and to negotiate collective bargaining agreements regarding wages, hours, and conditions of employment within eastern Washington.

Defendant Mechanical Contractors Association (MCA) is a multi-employer collective bargaining agent for mechanical contractor firms. It collectively bargains with Local. J. A. Jones is the only Defendant firm which belongs to MCA. Robert Morris was MCA's executive vice-president during relevant times. Bovee and Crail (B & C) and Bechtel are contractors who, like J. A. Jones, compete in national markets but, unlike Jones, belong to the National Contractors Association (NCA). Burns & Roe is WPPSS' project manager and architect and belongs to NCA. NCA, not a party, negotiates national collective bargaining agreements with Local's parent union-UA. Such a national agreement, binding upon the NCA member Defendants, existed during the period of time relevant to this case.

The NCA–UA (national) agreement subjected B & C, Bechtel, and Burns and Roe to the results of local collective bargaining in the geographical area of the particular jobsite. Thus, although NCA members did not participate in MCA, they had a vital economic interest in MCA negotiations with Local. WPPSS also had such an interest derived from contract provisions with major site contractors allowing wage increases to "pass through" to WPPSS. So far as these Defendants were concerned, wages, overtime rates, fringe benefit contributions, work days, and holidays all would be determined between Local and MCA through the collective bargaining process as pertains to pipefitters in eastern Washington. Facilitating and underscoring the convergence of these economic interests was Article XX in the national agreement. Article XX permitted NCA members to stop work and lockout in the event of an area strike instituted over local contract negotiations. The facts of this case developed in the context of such local negotiations.

National labor policy depends upon collective bargaining agreements and the process for reaching them as a primary means of achieving the desideratum of industrial peace and stability. More so than other forms of agreements, collective bargaining agreements contemplate a continuing relationship between the parties within the functional framework created in these agreements. Resolution of disputes is the goal rather than tolerance of disharmony and vindictiveness resulting in the idling both of business and employees. See, *United Steelworkers v. Warrior & Gulf*, 363 U.S.

574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). Indeed, employers and unions have an explicit statutory obligation to meet and bargain with one another in good faith" ... with respect to ... [inter alia] the negotiation of an agreement, or any question arising thereunder ..." 29 U.S.C. § 158(d). Not surprisingly, attainment of the desired goal is sometimes postponed, and as this case demonstrates, disharmony or even vindictiveness temporarily prevails.

The lawfulness of conduct in the traditional economic struggle between labor and management is generally measured under the standards of labor law and not antitrust law. However, in this instance Plaintiffs seek to apply the Sherman Act to conduct that this Court determines is within the economic heart of labor-management relations.

## FACTS

Local first recognized MCA's predecessor, PMC, as a multi-employer bargaining group under an agreement effective October 24, 1973. This agreement was renewed on September 26, 1974 to expire May 31, 1976. Local and MCA began to renegotiate March 12, 1976.

In the past Local bargained in units consisting of employers represented by MCA and in units with independent employers who negotiated directly. These separate collective bargaining agreements had different terms regulating the contributions to certain fringe benefit trusts established for Local's members. The disparities in trust fund arrangements were of concern to MCA during the contract renewal period. In fact, MCA filed a lawsuit in the case of *MCA v. Huico, NCA, Local 598, et al.*, No. C–75–6675 (W.D.Wa.) on April 2, 1976, under 29 U.S.C. § 186 and the Sherman Act, challenging payments into these funds as creating a substantial per man hour cost differential which gave non-MCA members a competitive advantage in bid pricing. Plaintiffs contend this issue is critical to an understanding of the Defendants' state of mind during the period covered by the lawsuit. However, as far as NCA members participation in these funds was concerned, the UA–NCA collective bargaining agreement [1] controlled.

We may assume that the *Huico* suit brought the fringe benefit fund issues to the attention of the present parties. However, MCA's proposed threshold collective bargaining issues, submitted to Local by letter of May 6, 1976, did not address the fund contribution problem. In any event, Local rejected MCA's proposal and apparently made no initiative or counter proposal of its own.[2] By May 31, 1976 the bargaining was at an impasse and on June 1, 1976, Local struck the MCA member firms except for J. A. Jones.

J. A. Jones employed 90 pipefitters at Hanford, Bechtel employed 600 and B & C employed 200. The majority of Local's working members were employed at Hanford. Approximately 800 members were employed outside Hanford by either MCA members or firms who had assigned their bargaining rights to MCA. On June 3, 1976, Bechtel, B & C, and Jones locked out. Local filed this action on June 18, 1976 charging all the Defendants with conspiring to lockout in order to restrain and monopolize trade. Nevertheless, Local had struck knowing the lockout would follow.

Shortly after the strike, Local signed an interim agreement with non-MCA member

---

1. The national agreement, Article VI, ¶ 34 (Sept. 1, 1975) provided in pertinent part that: "The employer (national agreement signatory) shall pay only fringe benefit funds ... established by a local collective bargaining agreement ... Nothing contained in this paragraph is intended to require the Employer to become a party to nor be bound by the local collective bargaining agreement except for the fringe benefit fund contributions as required herein, nor is any signatory employer required to assign his bargaining rights or become a member of any employer group or association as a condition for making such contributions. (Exhibit 1673, emphasis added).

2. See, CR # 424, B & C Reply Memorandum with Addendum. On June 8, 1976 MCA filed an unfair labor practice charge asserting Local's failure to inform MCA of the nature of its demands, and striking on June 1, upon nonmandatory subjects of bargaining. This claim settled prior to a complaint issuing from Regional NLRB.

contractors retroactively incorporating wages and fringe benefits "agreed upon in negotiations between the union and MCA or the National Agreement holders, whichever settlement is earlier agreed upon." MCA Exhibit 2646. Local also met with several non-MCA firms and agreed to recognize a new multi-employer bargaining group named the Tri-City Plumbing and Mechanical Contractors Association (Tri-City). The union membership ratified an agreement with Tri-City on October 2, 1976, but not until Local had presented it to MCA and, after MCA's refusal to accept it, notified each MCA member that Local would negotiate with them on a single-employer basis. Following ratification of the agreement, MCA filed another unfair labor practice charge against Local, alleging an attempt to withdraw from the historical multi-employer unit. This matter settled after the regional NLRB office issued a complaint. Local then filed a NLRB charge against MCA, Bechtel, Jones, Burns & Roe, and B & C alleging that the lockout resulted from a conspiracy in support of MCA's goal to force Local to recognize MCA as the exclusive bargaining agent for all firms employing pipefitters in Local's jurisdiction. On appeal, NLRB General Counsel upheld the Regional Director's refusal to issue a complaint based on Local's allegations.

Prior to this latter activity the national agreement holders and UA executed a project agreement which included J. A. Jones. It set forth the economic terms that Local and MCA had been unable to settle. As to the national agreement holders and J. A. Jones, the strike and lockout ended on November 23, 1976. Finally, MCA acceded to the Tri-City agreement on January 26, 1977.

■ The case proceeds under Plaintiffs' third amended complaint filed April 3, 1980, CR # 374, after 4 years of voluminous discovery.[3] The gravamen of the claim rests in paragraph 12 of the amended complaint

and alleges that on June 1, 1976 "approximately 900 employees represented by Plaintiff were locked out." From this singular fact Plaintiffs contend: (1) the lockout was a means to implement an agreement between Defendants to force Local to agree to MCA's 1976 negotiating demands; (2) this violates Sections 1 and 2 of the Sherman Act; (3) wages and fringe benefit losses resulted; and (4) for this, Plaintiff is entitled to treble damages and a permanent injunction. The amended complaint attempts to depict a coercive group boycott designed to effectuate a concerted refusal to deal, which, if carried out with anti-competitive design or effect, constitutes a per se violation of Section 1 of the Sherman Act.

Defendants move for summary judgment of dismissal based on the grounds that (1) their activities are not restraints of trade within the intendment of the Sherman Act's protection of the freedom of competition; (2) their conduct is immune from antitrust penalty by the statutory and non-statutory labor exemptions; and (3) Plaintiffs lack standing to contest any arguable antitrust violations arising from Defendants' conduct. WPPSS separately moves for dismissal of the complaint for failure to state a claim.

■ For the purposes of a motion to dismiss, the Court must not go outside the pleadings. All well pleaded facts must be taken as true. The focus under a motion to dismiss must be whether it is clear that Plaintiffs would be entitled to no relief under any state of facts that might be proved in support of the *allegations made* in the complaint. *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Consistent with the allegations of their complaint, Plaintiffs could not prove any set of facts that would constitute a violation of the antitrust laws. Dismissal is, in this case, therefore, proper. *Timberlane*

---

**3.** Plaintiff must have some factual basis for an antitrust action before he files suit; he cannot expect the discovery process to reveal evidence of a violation that he merely suspects or hopes to find. See, *Program Engineering v. Triangle Publications*, 634 F.2d 1188, 1193–1194 (9th Cir. 1980). Nevertheless, Courts generally have concern for a claimant, facing a motion for summary judgment or dismissal for failure to state a claim, who might not know, before discovery, which facts to allege. There is no need for similar concern in this case.

**1306**

Lumber Co. v. Bank of America, 549 F.2d 597, 603 (9th Cir. 1976).

 Assuming Plaintiff could prove an agreement, that agreement, Plaintiff maintains, was an "agreement in anticipation of and for the purpose of forcing" the union to accede to negotiating demands. Both the object and effect of such an arrangement would be lawful under the Sherman Act. It also appears to be a lawful combination within the meaning of the labor laws. See, Newspaper Drivers & Handlers v. N.L.R.B., 404 F.2d 1159 (6th Cir. 1968). Plaintiff alleges the effect of the concerted activity was to halt construction work at Hanford. This, of course, is a necessary effect of a lockout. It is a tautology to assert that a lockout halted work and this is not an effect Congress prohibited by enacting the Sherman Act. The Sherman Act seeks "to prevent and control combinations made with a view to prevent competition, or for the restraint of trade." U. S. v. Topco, 405 U.S. 596, 613, 620, 92 S.Ct. 1126, 1136, 1140, 31 L.Ed.2d 515 (1972).

Justice Stone writing for the Court in Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940) declared that the Sherman Act was not intended to cover any activity by anyone unless that activity had, or was intended to have, a substantial effect upon commercial competition. This he termed the "sine qua non" of antitrust liability. Justice Stone then specifically determined that the antitrust laws would not be applicable, even were commerce adversely affected, if the challenged restraint resulted from the elimination of differences in labor standards.

 Plaintiffs fail to allege facts which show how competition was adversely affected by Defendants' conduct. They also fail to allege facts which show what their justiciable interest in such, or any competition, so affected might be. To sue under the antitrust laws a Plaintiff must suffer a direct injury as a result of the anticompetitive consequences of Defendants' acts. If there is not direct injury, then he cannot sue even if he suffered injury as a result of his economic relationship to a target of the conspiracy or to one of the conspirators.

Thus, employees of targets or of conspirators have been denied standing to sue. See, Long Island Lighting v. Standard Oil, 521 F.2d 1269, 1274 (2nd Cir. 1975), cert. denied, 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 83 (1975).

 The work as the employee of another is not an independent business enterprise and therefore the loss of employment is not such injury as the Clayton Act § 4, 15 U.S.C. § 15, protects. Nor is the opportunity to perform work property in the ordinary sense, although the loss of any opportunity to be employed may in limited circumstances form the basis for damages under the antitrust laws. See, Internat. Ass'n v. United Contractors, 483 F.2d 384, 397–98 (3rd Cir. 1973). But that is not the claim here. There are no allegations permitting the notion that the employees were in the target area of an alleged antitrust violation or that they were injured in any way other than as employees. There is no alleged connection between the temporary loss of wages or dues to the Local, and the breakdown of competition in the market place for mechanical contractor services, for example. The complaint fails to show either an antitrust injury to the employees or, standing to sue and the complaint is properly dismissed as to the employees. See, Solinger v. A & M Records, Inc., 586 F.2d 1304, 1311–12 n.8 (9th Cir. 1978), cert. denied, 441 U.S. 908, 99 S.Ct. 1999, 60 L.Ed.2d 377 (1979); Conference of Studio Unions v. Loew's, 193 F.2d 51, 54 (9th Cir. 1951), cert. denied, 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687; Prepmore Apparel, Inc. v. Amalgamated Clothing Workers of America, 431 F.2d 1004 (5th Cir. 1970); Amalgamated Meat Cutters v. Wetterau, 597 F.2d 133 (8th Cir. 1979).

 Under the Section 1 conspiracy allegations, Local also cannot be the victim of an anticompetitive objective or antitrust injury. Local is in the business of negotiating collective bargaining agreements and organizing and representing employee interests under such agreements. That business is not restrained in an anticompetitive sense by a lockout agreement. Local's

damages claim is not connected to restriction or interference in business affairs entailed to Local's statutory rights or duties and attributable to something forbidden by the antitrust laws.

The case of *International Ass'n v. United Contractors, supra,* presents a comparison. There the union complained of loss of its right to be the bargaining agent of its member employees because of defendants' conspiracy with the defendant union to gain a competitive advantage in the employers' market place. There is neither a competing union, nor a sham union, nor any boycotted union related employers involved in this case. See, cases cited in *Amalgamated Meat Cutters v. Wetterau, supra,* 137. The Defendants did not allegedly invade or infiltrate the union offices or supplant union members with its own in order to gain control in support of an anticompetitive scheme.

▮▮▮▮ Indeed, implicit in the complaint is the contending notion that the Plaintiffs resisted and repelled the coercive force behind the negotiating demand with its bargaining autonomy left unfettered or unrestricted. Arms length bargaining with the use of strike and lockout for the purpose of requiring a term in a collective bargaining agreement does not upset the economic competitive balance and tension built into the Sherman Act. *United Mine Workers v. Pennington,* 381 U.S. 657, 667–68, 85 S.Ct. 1585, 1591–1592, 14 L.Ed.2d 626 (1965). The natural competitive relationship between Local and MCA, directly connected to these organizations "raison d'etre", is not in the realm of *commercial* competition. Rather it is in the realm of pure economics—the historical struggle between management and labor with each attempting to maximize its own interests. The labor laws and not the antitrust laws regulate this struggle.

▮▮▮▮ The premise that labor itself is an article of commerce is removed from contemplation of the antitrust laws. 15 U.S.C.

§ 17. An agent of labor, whose job it is to negotiate agreements regarding labor, wages, hours, and conditions of employment is not injured in an antitrust sense by a lockout designed to limit labor's unilateral expectations and demands. The case is, therefore, clearly different than one in which another union and employer combine for an anticompetitive purpose.

▮▮▮▮ It is not possible in law or fact to find a competitive relationship between the parties within the confines of the complaint and from that infer a possibility that the "refusal to deal" effected by lockout was a product of an anticompetitive motive. Concededly, the purpose and effect of the concerted relationship may be indirect and as such would present a question of whether the activities unreasonably restrained trade. In that case the issue is not the existence or non-existence of concerted refusal to deal "but rather whether the purpose and effect of the [combination] was such as unreasonably to exclude outsiders from participation in the trade in question." *Bridge Corp. v. American Contract,* 428 F.2d 1365, 1370 (9th Cir. 1970), *cert. denied,* 401 U.S. 940, 91 S.Ct. 940, 28 L.Ed.2d 220 (1971). Under such circumstances the nonstatutory labor exemption would become an almost insurmountable hurdle to a proper Plaintiff with standing.[4] However, that too is not the case Plaintiff presents. If it were, Plaintiff would still have no standing to claim injuries due to Defendants' activities.

Plaintiffs' monopolization claim is raised solely by inference from reference to Section 2 of the Sherman Act, 15 U.S.C. § 2, as the jurisdictional statement in the complaint. There are no allegations showing a particular Defendant's power to control prices or exclude competition nor are there allegations involving the abusive or unfair acquisition, maintenance, or misuse of monopoly power in product and geographical market.

---

4. Appearing as it does to fall within the context of a collective bargaining relationship and not imposing a direct restraint upon business, any indirect effect on competition would not contravene antitrust policies to a degree not justified by congressional labor policy. Defendants would be entitled to claim nonstatutory exemption.

An attempt to monopolize and a conspiracy to monopolize claim both require an allegation of some conduct permitting an inference of specific intent to monopolize. But where the circumstances involve ambiguous conduct, as alleged, the requisite degree of danger may not exist in the absence of an allegation of appreciable market power. Plaintiff does not plead that one or all of the Defendants engaged in conduct resulting in anticompetitive effects or with the intent of forcing Plaintiff out of business, or with the purpose and effect of obstructing, restraining or excluding competition by others. Nor are any assertions supportive of that conclusion or of attributable injury to Plaintiffs made. The monopoly claim is thus manifestly without merit. WPPSS' motion to dismiss is, therefore, granted.

Of course, dismissal of the complaint for failure to state a claim benefits all Defendants. There is no necessity to rule upon the motion for summary judgment. However, given the length of time this case has been in process, the interests involved, the extensive discovery and preparation of briefs, the Court decides the motions for summary judgment. Besides the obvious legal defects in Plaintiffs' Section 1 theory, the facts themselves cannot support Plaintiffs' contentions of a conspiracy in violation of the Sherman Act. As noted above, Plaintiffs have not pled nor do they factually develop their Section 2 monopolization charge.

Summary judgment is proper in antitrust litigation where the moving parties show that there is no genuine issue of material fact or where, viewing the evidence and the reasonable inferences that can be drawn therefrom in the light most favorable to the opposing party, the moving party clearly is entitled to prevail as a matter of law. F.R. C.P. 56(c). *Vaughn v. Teledyne*, 628 F.2d 1214, 1220 (9th Cir. 1980).

Plaintiffs' contend in their opposition brief [5] that MCA engaged in certain activi-

ties in order to achieve the objective of "monopoly control of the bargaining process". The other Defendants allegedly supported MCA's objective by agreeing to lockout. Plaintiffs offer two primary pieces of evidence to support its case: the May 6, 1976 MCA letter of proposed threshold collective bargaining issues (MCA proposal) and the series of lawsuits which MCA (and predecessor PMC) filed, culminating in the *Huico* suit.

Plaintiffs argue that the lawsuits, especially the *Huico* suit, prove MCA's *ultimate* motive, known and supported by other Defendants, to control the participation and allocation of payments in fringe benefit trust funds in order to equalize what previously was competitive advantage in bid pricing based upon differences in the collective bargaining agreement terms which Local separately negotiated with non-MCA members. However, the lawsuits appear to raise legitimate concerns of a multiemployer bargaining group representative. The issue, for example, of which employers should participate in a multiemployer group fringe benefit trust fund is an area of real concern under the labor laws. See, *Walsh v. Schlecht*, 429 U.S. 401, 404–405 n.3, 411–12, 97 S.Ct. 679–683 n.3, 686–687, 50 L.Ed.2d 641 (1977). See also, *Amax Coal v. N.L.R.B.*, 614 F.2d 872 (3rd Cir. 1980); *Air & Refrigeration Co. v. Plumbing & Pipe Fitting Trust*, 159 F.Supp. 887 (D.Cal.), aff'd, 253 F.2d 427 (9th Cir. 1958); *Denver Metro Ass'n v. Journeyman Plumbers*, 586 F.2d 1367 (10th Cir. 1978); *Huge v. Long's Hauling co.*, 590 F.2d 457 (3rd Cir. 1978). Moreover, issues regarding contributions to benefit plans have been held to be proper and mandatory subjects of bargaining. *T.T.P. Corporation*, 190 N.L.R.B. 240 (1971).

Whether or not these lawsuits were baseless, and there is no indication that they were, their filing is not proper evidence of anticompetitive purpose. These

---

5. Several Defendants filed affidavits in support of their motions for summary judgment. Plaintiffs filed no affidavit. Moreover, Plaintiffs' statement of issues of material fact is essentially a statement of ultimate facts it would seek to prove at trial. See, CR # 408. However, in its opposition memorandum, Plaintiffs attempt to dispute and raise genuine issues of material fact.

suits express MCA's concern for the operation of trust funds, allocation of costs, and advantage to competitors of the funds' participants. MCA's challenge to the anticompetitive effect of Local's trust fund arrangements with others does not by innuendo warrant the converse premise that the suits manifest MCA's anticompetitive designs or were a "means or pretext for achieving the substantive evil" of suppressing competition. *California Transport v. Trucking Unlimited*, 404 U.S. 508, 513, 92 S.Ct. 609, 613, 30 L.Ed.2d 642 (1971).

 The second piece of evidentiary support is likewise unsupportive. The MCA proposal of "Threshold Collective Bargaining Issues" for the new agreement is merely a proposal in the course of negotiations.[6] It does not support what Local claims. The proposal stated that the terms of the agreement would bind the Local and members of MCA and assignors, but that "no other employer shall be considered bound". The employers who were bound are defined as entities engaged in plumbing and pipefitting work "who [are] ... members of MCA", assigned bargaining rights to MCA, or agreed to become a party to the agreement. It does not rationally follow from the plain text of this proposal that all employers in Local's jurisdiction would be bound by its term or that, by some unexplained mechanism, either intrinsic or extrinsic to the proposal, Local could not again collectively bargain outside the MCA multiemployer unit. The proposal cannot form the factual basis for an allegation that MCA attempted to force Local to agree to its terms in order to monopolize some other market. Besides, that is not the complaint.

 If the aim of this lawsuit is to prove that MCA sought industry wide bargaining by expansion of its unit, then the incidental commercial restraint which may flow from such activity does not constitute the "type" of restraint to which the Sherman Act is intended to apply. The effect of such bargaining would be an equalization of labor standards—a proper goal of labor law. If, in the last analysis, MCA sought the power of an expanded multiemployer bargaining unit, that presents an issue clearly within the NLRB's authority. The NLRB determines whether a multiemployer group is appropriate and it does so by reference to whether employees have unequivocally indicated an intent to be bound, whether the union has been properly notified of the formation of the group and the delegation of bargaining authority to it, and whether the union has assented and entered negotiations with the group representative. See, e. g. *Weyerheuser Co.*, 166 N.L.R.B. 299 (1967). See also, *Western States Regional Council v. N.L.R.B.*, 398 F.2d 770, 773 (D.C.Cir.1978); *N.L.R.B. v. Great At. & Pac. Tea Co.*, 340 F.2d 690 (2nd Cir. 1965). Thus, the union, its members, and the NLRB are controlling actors in the employer group expansion process.

In this instance, Local began negotiations with non-MCA members shortly after the lockout. It both recognized and signed an agreement with a newly formed employer group during the strike and lockout period. Obviously, its freedom to do so was unimpaired by the lockout. Again, the question: what trade of Local was restrained? Local and its employees relationship with independent contractors was unaffected through the strike and lockout. Indeed, Local's interests in relationships with non-MCA members appears to have been strengthened.

6. Local characterizes this as a demand backed by the coercive force of the lockout. But Local rejected MCA's proposal, presented no counter proposal, and struck, aware that the Defendants intended to lockout. The union could freely reject any "demand" so long as it bargained in good faith. Presented with an impermissible motivated negotiating demand Local could have filed a complaint with the NLRB. The union had other choices. It could consent to an agreement containing an unlawful demand and safely refuse to abide by a term the effective enforcement of which would violate Section 1 or 2 of the Sherman Act. *Connell Construction v. Plumbers & Pipefitters*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). It could sue for declaratory or injunctive relief. Mere participation in a collective bargaining agreement does not predicate antitrust liability and standing alone, signing an agreement which has an anticompetitive effect does not violate the Sherman Act. See, *Local Union v. Jewel Tea*, 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965).

In short, the lockout action is not evidence of a design either to interfere with the operation of independent contractors business or to interfere with the bargaining autonomy of the Local. Neither the MCA proposal nor the lawsuits are evidence of an objective prohibited by the antitrust laws or are they evidence that Plaintiffs' injury is of the type the antitrust laws were intended to prevent and that flows from that which makes Defendants' acts unlawful. See, *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1976).

The Court will not condemn the practice of joining together to lockout as posing an incipient threat to competition. Such a holding would blur the distinction between guilty and innocent commercial behavior. The Complaint has no factual allegations of an *antitrust* conspiracy and the record will not support such allegations. That MCA came to the negotiations with the support of the other Defendants does not warrant an inference that such support was solicited or given on other than the basis of attempting to hold the line on wages and fringe benefits. A common objective to reduce labor's bargaining strength, the justification Defendants attribute to their activities, in order to bring Local more in line with MCA's economic demands, is not an objective forbidden by the antitrust laws. The evidence would not permit a jury to separate the consequences of economic pressure designed to achieve both lawful and allegedly unlawful objectives nor to find that the alleged loss of wages and fringe benefits were caused by the coercion exerted to achieve an unlawful objective. Plaintiffs may not resort to speculation to require a jury "to resolve the differing versions of the truth at trial." *British Airways v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978).

After Defendant provides probative evidence showing alternative legitimate business reasons for their conduct, to rebut the allegations of an antitrust conspiracy, Plaintiffs must come forward with some factual support for its allegation, with evidence sufficient to infer an agreement among the Defendants to take some concerted anticompetitive action. The specific evidence Plaintiffs offer is the filing and content of lawsuits coupled with the knowledge in the industry of these suits. Whether or not the Noerr—Pennington exclusion of this activity being used as evidence applies here, MCA's activity in court simply does not support the complaint's allegations. These suits are not probative of other Defendants' intent to agree with MCA to lockout for the purpose of *anticompetitive* ends and the agreement to lockout to affect collective bargaining is not illegal under the antitrust laws. Defendants' interests for a low cost economic package in the negotiations obviously parallel and, in that goal, agree with any employer group facing a union in renegotiation of a contract. That Defendants may lockout in support of that interest is irrefutable. See, *N.L.R.B. v. Brown*, 380 U.S. 278, 287–88, 85 S.Ct. 980, 985–986, 13 L.Ed.2d 839 (1965); *N.L.R.B. v. Tomco*, 567 F.2d 871 (9th Cir. 1978); *Newspaper Drivers v. N.L.R.B.*, 404 F.2d 1159 (6th Cir. 1968). It is implausible to maintain that the NCA members rationally supported an alleged scheme which would, in effect, either give local contractors a competitive advantage over them or permit MCA control over their freedom to continue negotiating favorable contracts in the NCA–UA unit.

There is no evidence of MCA's anticompetitive purpose. An antitrust complainant that fails the necessary condition of offering some probative evidence to support the claim is not entitled to proceed to trial. *First Nat'l Bank of Arizona v. Cities Service*, 391 U.S. 253, 280, 289–290 n.18, 88 S.Ct. 1575, 1588, 1592–1593 n.18, 20 L.Ed.2d 569 (1968). More fundamental, as discussed under the 12(b)(6) motion to dismiss, the complaint itself is insufficient to claim antitrust injury or Plaintiffs' standing to assert a violation of the antitrust laws. Consequently, the motions for summary judgment of dismissal must be granted—to include individual Defendant John Morris' motion.

The Court need not reach the issues of a statutory or non-statutory exemption but

does so. At argument, Plaintiffs gave primary weight to the terms of MCA's proposal and to the historical Local-MCA labor relations context in which the proposal was offered. The complaint itself contends that the lockout occurred as a means to force concessions to terms in negotiation of a collective bargaining agreement.

It is clear this case grows out of a labor dispute as defined in the Norris-LaGuardia Act, 29 U.S.C. § 113. That Act removes the jurisdiction of the Court to issue an injunction in such a case. 29 U.S.C. § 104. Defendants use of economic power to bring pressure upon the union to affect collective bargaining negotiations raises the special policy concerns expressed in the Act. 29 U.S.C. § 107. The employers can assert this statutory protection and did so. See, *Amalgamated Transit Union v. Greyhound*, 529 F.2d 1073, 1078 (9th Cir. 1976); *Clune v. Publishers Ass'n*, 214 F.Supp. 520 (S.D.N.Y.), aff'd, 314 F.2d 343 (2nd Cir. 1963); *Detroit News v. Detroit Typo*, 471 F.2d 872, 876–77 (6th Cir. 1972). See also, 75 Cong.Rec. 4507 (1932). Consequently, under these terms Plaintiffs would not be entitled to an injunction. Furthermore, Plaintiffs make no showing of irreparable injury. The facts do not demonstrate any threat of recurrence and other remedies would be quite adequate. See, footnote 6, *supra*.

The Court also holds that the Defendants are entitled to a non-statutory exemption. The term non-statutory exemption describes an interpretation of the Sherman Act making that statute inapplicable to restraints imposed in the interest of lawful monopoly power in the labor market. Implicit in the exemption is a differentiation between the market for goods and services and the labor market.

Defendants' conduct falls squarely within the exemption's rationale to protect competition and power to eliminate competition in the labor market over the mandatory subjects of bargaining. The complaint alleges a restraint operating on that primary market and such restraints are presumptively outside the scope of the Sherman Act. Even construing the exemption

narrowly, as the Court must, there is no basis in fact to weaken the force of the presumption. Assuming the conspiracy and its goal to force the union to agree to bargaining demands, as Local contends, this was not the kind of curtailment of competition prohibited by the Sherman Act. There is no showing nor allegation to raise a suspicion that the lockout agreement was aimed at controlling a secondary service market. Cf. *Allen Bradley v. Local No. 3*, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945) (union negotiated refusal to deal clauses with local manufacturers and such agreements created a product market cartel looking to both price and market control as well as terms and conditions of employment; union assisted in policing and protecting the cartel. Held: union participation was antitrust violation despite the existence of a collective bargaining relationship and the refusal to deal clauses connection to wage and job stability).

The subject matter of the MCA proposal was clearly related to mandatory subjects of collective bargaining. The alleged lockout agreement embodies a "direct frontal attack upon a problem thought to threaten legitimate employer interests in collective bargaining. All of Defendants' conduct, both as alleged by Plaintiffs and demonstrated by the record evidence, was aimed at eliminating competition over labor standards. Therefore, Defendants' actions fall within the non-statutory exemption to the federal antitrust laws.

After oral argument, Plaintiffs submitted the 9th Circuit panel decision in the case of *California State Council v. Associated General*, 648 F.2d 527 (9th Cir. 1980) in application to this case. The Court, however, finds *California State Council* inapposite. The California State Council, a council of unions having collective bargaining agreements with defendant employer group, charged that defendants conspired to coerce owners, who let bids, to hire only contractors and subcontractors who did not sign collective bargaining agreements with the *Council* unions. The union also alleged that defendant's members conspired to subcontract only with subcontractors who had not signed with

the unions. *California State Council*, thus presented a critically different case than the case brought by the complaint in this court. The panel in *California State Council* characterized the alleged restraint as a coercive refusal to deal which affected "commercial competition in the 'marketing of goods or services' in that its effect would be to preclude union-signatory subcontractors from a portion of the market for carpentry work. Plaintiff in this case neither alleged nor evidenced restraint upon commercial competition—a pre-requisite to the application of the Sherman Act. *Id.* at 531 (citations omitted).

The unions in *California State Council* had standing since they could show the two elemental prerequisites: factual and legal causation of injury by "anything forbidden in the antitrust law." Unlike *California State Council* unions, Local's legal right in the business of organizing, negotiating, and securing jobs was wholly unaffected by Defendants activities. Nor was Local's business either the target or in the target area of the economy endangered by a breakdown of competitive conditions.

The panel in *California State Council* did not decide that employers may not hold a statutory exemption. It decided only that in vastly different circumstances the Defendant in that case was not entitled to a statutory exemption. Moreover, the non-statutory exemption was not applied because the agreement did not serve as a direct attack upon matters involving mandatory subjects of bargaining. The agreement in the instant case did. Any further distinction between the cases is unnecessary.

For the above reason, the Court grants:

1. Washington Public Power Supply System's Motions for 12(b)(6) Dismissal and Summary Judgment of Dismissal.

2. John Morris' Motion for Summary Judgment of Dismissal.

3. Mechanical Contractors Associations of Washington Motion for Summary Judgment of Dismissal.

4. J. A. Jones' Motion for Summary Judgment of Dismissal.

5. Bovee & Crail Motion for Summary Judgment of Dismissal.

6. Bechtel's Motion for Summary Judgment of Dismissal.

7. Burns & Roe's Motion for Summary Judgment of Dismissal.

IT IS SO ORDERED that all Defendants' Motions for Dismissal are GRANTED with prejudice.