Tom BRADY; Drew Brees; Vincent Jackson; Ben Leber; Logan Mankins; Peyton Manning; Von Miller; Brian Robison; Osi Umenyiora; Mike Vrabel; Carl Eller; Priest Holmes; Obafemi Ayanbadejo; Ryan Collins; Antawan Walker, individually, and on behalf of all others similarly situated, Appellees,

v.

NATIONAL FOOTBALL LEAGUE; Arizona Cardinals Football Club, LLC; Atlanta Falcons Football Club, LLC; Baltimore Ravens Limited Partnership; Buffalo Bills, Inc.; Panthers Football, LLC; The Chicago Bears Football Club, Inc.; Cincinnati Bengals, Inc.; Cleveland Browns Football Company LLC; Dallas Cowboys Football Club, Ltd.; PDB Sports, Ltd., doing business as The Denver Broncos Football Club, Ltd.; The Detroit Lions, Inc.; Green Bay Packers, Inc.; Houston NFL Holdings, L.P.; Indianapolis Colts, Inc.; Jacksonville Jaguars, Ltd.; Kansas City Chiefs Football Club, Inc.; Miami Dolphins, Ltd.; Minnesota Vikings Football, LLC; New England Patriots L.P.; New Orleans Louisiana Saints, L.L.C.; New York Football Giants, Inc.; New York Jets LLC; The Oakland Raiders, L.P.; Philadelphia Eagles, LLC; Pittsburgh Steelers LLC; The St. Louis Rams LLC; Chargers Football Company, LLC; San Francisco Forty Niners, Limited; Football Northwest LLC; Buccaneers Limited Partnership; Tennessee Football, Inc.; Pro–Football, Inc., Appellants.

No. 11–1898.

United States Court of Appeals, Eighth Circuit.

Submitted: May 2, 2011.

Filed: May 16, 2011.

Paul D. Clement, Washington, DC, argued, for appellants.

Theodore B. Olson, Washington, DC, argued, for appellees.

Before BYE, COLLOTON, and BENTON, Circuit Judges.

PER CURIAM.

This is an appeal by the National Football League and 32 separately-owned NFL teams (collectively the "NFL" or the "League") from an order of the district court issuing an injunction that prohibits the League from continuing to impose a "lockout" of NFL players. *Brady v. NFL*, No. 11–639, —— F.Supp.2d ——, 2011 WL 1535240 (D.Minn. Apr. 25, 2011). The named plaintiffs (the "Players") are nine professional football players and one prospective player who brought an action on behalf of themselves and similarly situated players, alleging that the lockout is a "group boycott" that violates the federal antitrust laws and state contract and tort law. On April 25, 2011, the district court entered an order declaring that "the 'lockout' is enjoined." Two days later, the court denied the League's motion for a stay of the order pending appeal. *Brady v. NFL*, No. 11–639, —— F.Supp.2d ——, 2011 WL 1578580 (D.Minn. Apr. 27, 2011).

The League filed a notice of appeal, moved in this court for a stay of the district court's order pending appeal, and sought expedited hearing of the appeal. On April 29, 2011, we granted a temporary administrative stay of the district court's order to allow the court sufficient opportunity to consider the merits of the motion for stay pending appeal. On May 3, 2011, we granted the League's motion to expedite the appeal, established a briefing schedule, and designated June 3, 2011, as the date for oral argument and submission of the case. For the reasons that follow, we now grant the League's motion for stay pending appeal.

I.

There is a long history of litigation between the NFL and professional football players, much of which is described in prior opinions of this court and the district court. *See, e.g., White v. NFL*, 585 F.3d 1129 (8th Cir.2009); *White v. NFL*, 41 F.3d 402 (8th Cir.1994); *Powell v. NFL*, 930 F.2d 1293 (8th Cir.1989); *Mackey v. NFL*, 543 F.2d 606 (8th Cir.1976). For purposes of resolving this motion, an abbreviated summary of the more recent history will suffice. In 1992, a jury rendered a verdict in favor of several players, determining that the League's limits on the ability of players to move from team to team after their contracts expire violated Section 1 of the Sherman Antitrust Act. *McNeil v. NFL*, 1992 WL 315292, at *1 (D.Minn. Sept. 10, 1992). Shortly thereafter, several players brought another antitrust action seeking to prevent the League from imposing any restrictions on the movement of players whose contracts expired on February 1, 1993. *White v. NFL*, 822 F.Supp. 1389, 1395 (D.Minn.1993). In February 1993, the League and a class of NFL players entered into a Stipulation and Settlement Agreement to resolve that litigation. The settlement agreement provided that the district court would retain jurisdiction over enforcement of the agreement. *See White v. NFL*, 836 F.Supp. 1458, 1473 (D.Minn.1993).

Later that year, the National Football League Players Association ("NFLPA"), as the exclusive collective bargaining representative of the NFL players, and the NFL Management Council, the multi-employer bargaining unit of the NFL owners, reached a new collective bargaining agreement. The agreement was amended and extended several times, and each time, the enforcement jurisdiction of the district court was retained as part of the agreement. *White*, 585 F.3d at 1134. In May 2008, however, the NFL exercised its right to opt out of the last two years of the most recent agreement, and both the settlement agreement and the collective bargaining agreement were thus due to expire at 11:59 p.m. on March 11, 2011.

For two years prior to the expiration of the agreements, the Players and the League engaged in negotiations over a new collective bargaining agreement, but they did not resolve their differences. As the expiration date approached, the League indicated that it might use a lockout of the players as a tactic in the bargaining process. *See Am. Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 301–02, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965). The Players then determined that it would not be in their interest to remain unionized, because the existence of the union would "allow the NFL to impose anticompetitive restrictions with impunity," Compl. ¶ 54, so they took steps to terminate the NFLPA's status as their collective bargaining agent as of 4:00 p.m. on March 11. The NFLPA notified the League that as of 4:00 p.m. on March 11, it disclaimed any interest in representing the Players in further negotiations.

Also on March 11, the Players filed their complaint in this action, alleging that the lockout threatened by the League would violate the federal antitrust laws and state contract and tort law. Among other relief, the Players sought a preliminary injunction that would prohibit the League from imposing or continuing the lockout.

On March 12, the League imposed a lockout of the Players. At that point, the League notified players under contract that, among other things, they were not permitted to enter team facilities except in connection with a non-team event or a charitable event, they would not receive compensation or health insurance benefits from their teams, and they were not permitted to play, practice, workout, attend meetings, or consult with team medical or training staff at team facilities. The League also filed an amended unfair labor practice charge with the National Labor Relations Board on March 11, alleging that the NFLPA's disclaimer was a "sham" and that the combination of a disclaimer by the union and subsequent antitrust litigation was a "ploy and an unlawful subversion of the collective bargaining process." The League had filed a previous charge in February 2011, alleging that the union failed to confer in good faith during negotiations over a new collective bargaining agreement.

After receiving briefs and affidavits from the parties and hearing oral argument from counsel, the district court entered an order that enjoined the lockout. The court rejected the League's argument that a federal statute, the Norris–LaGuardia Act, 29 U.S.C. § 101, *et seq.*, deprived the court of jurisdiction to grant injunctive relief, because the court concluded that this is not a case "involving or growing out of a labor dispute" as defined by the Act. The court also rejected the League's position that it should stay the case, under the doctrine of primary jurisdiction, *see Reiter v. Cooper*, 507 U.S. 258, 268–69, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993), pending a decision by the National Labor Relations Board on the League's unfair labor prac-

tice charges. The court determined that the Players had demonstrated that they were suffering, and would continue to suffer, irreparable harm as a result of the lockout, that the harm to the Players outweighed any harm an injunction would cause the NFL, and that the Players had a fair chance of success on the merits of their lawsuit. On the merits, the court concluded that the non-statutory labor exemption from antitrust liability, *see Brown v. Pro Football, Inc.*, 518 U.S. 231, 116 S.Ct. 2116, 135 L.Ed.2d 521 (1996), does not extend "to protect the labor negotiation tool of a 'lockout,' as opposed to a mandatory term of collective bargaining, after a union has disclaimed any further representation of its members." *Brady*, —— F.Supp.2d at ——, 2011 WL 1535240, at *36. For these reasons, the court entered the preliminary injunction.

## II.

 Federal Rule of Appellate Procedure 8(a) governs the power of a court of appeals to stay an order of a district court pending appeal. Under that Rule, we consider four factors in determining whether to issue a stay: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987). The most important factor is the appellant's likelihood of success on the merits. *Shrink Mo. Gov. PAC v. Adams*, 151 F.3d 763, 764 (8th Cir.1998); *S & M Constructors, Inc. v. The Foley Co.*, 959 F.2d 97, 98 (8th Cir.1992). The movant must show that it will suffer irreparable injury unless a stay is granted. *Packard Elevator v. ICC*, 782 F.2d 112, 115 (8th Cir.1986); *cf.*

*James River Flood Control Ass'n v. Watt*, 680 F.2d 543, 544 (8th Cir.1982) (per curiam) (granting stay pending appeal after determining that "it appears that the United States may suffer irreparable injury unless this court grants the stay"). Ultimately, we must consider the relative strength of the four factors, "balancing them all." *Fargo Women's Health Org. v. Schafer*, 18 F.3d 526, 538 (8th Cir.1994) (appendix); *see also Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C.Cir.1958) (per curiam) ("[I]njury held insufficient to justify a stay in one case may well be sufficient to justify it in another, where the applicant has demonstrated a higher probability of success on the merits."); Developments in the Law, *Injunctions*, 78 Harv. L.Rev. 994, 1056 (1965) ("Clear evidence of irreparable injury should result in a less stringent requirement of certainty of victory; greater certainty of victory should result in a less stringent requirement of proof of irreparable injury."), *quoted in Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 388 (7th Cir.1984).

 We consider first the League's likelihood of success on the merits. We do not make a final determination on the merits, but consideration of likely success is unavoidable, for the governing standard "compels us to embark upon such an exercise." *Fargo Women's Health Org.*, 18 F.3d at 538.

The Norris–LaGuardia Act limits the jurisdiction of a district court to issue an injunction "in a case involving or growing out of a labor dispute." 29 U.S.C. § 101. The district court ruled that the Act does not apply here and that it had jurisdiction to enjoin the lockout.

 Congress wrote the Act in broad language, in order to take the federal courts " 'out of the labor injunction busi-

ness.'" *Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n,* 457 U.S. 702, 712, 102 S.Ct. 2672, 73 L.Ed.2d 327 (1982) (emphasis omitted) (quoting *Marine Cooks & Stewards v. Panama S.S. Co.,* 362 U.S. 365, 369, 80 S.Ct. 779, 4 L.Ed.2d 797 (1960)). "No court of the United States shall have jurisdiction to issue any ... temporary or permanent injunction in any case involving or growing out of a labor dispute to prohibit any person or persons participating or interested in such dispute ... from doing, whether singly or in concert," any of several acts. 29 U.S.C. § 104. One of these acts is "refusing ... to remain in any relation of employment." 29 U.S.C. § 104(a).

Congress's definition of a "labor dispute" is expansive: "The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in ... seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee." 29 U.S.C. § 113(c). "Congress made the definition broad because it wanted it to be broad." *Order of R.R. Telegraphers v. Chi. & N.W. R.R. Co.,* 362 U.S. 330, 335–36, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960); *see Jacksonville Bulk Terminals,* 457 U.S. at 712, 102 S.Ct. 2672 (observing that "the statutory definition itself is extremely broad").

Congress also explicitly stated the meaning of "involving or growing out of" a labor dispute. "A case shall be held to involve or grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation...." 29 U.S.C. § 113(a). Congress described categories of such disputes in sweeping terms: "[W]hether such dispute is (1) between one or more employers or associations of employers and one or more employees or associations of employees; ... or when the case involves any conflicting or competing interests in a 'labor dispute' [as defined in section 113(c) quoted above] of 'persons participating or interested' therein." *Id.* A person or association is

> participating or interested in a labor dispute if relief is sought against him or it, and if he or it ... is a member ... of any association composed in whole or in part of employers or employees engaged in [the same] industry, trade, craft, or occupation [in which such dispute occurs].

29 U.S.C. § 113(b).

The district court apparently did not question that this case is a "controversy concerning the terms and conditions of employment." 29 U.S.C. § 113(c). The complaint seeks relief concerning such terms and conditions, and the lawsuit was filed on the same day that the Players' union discontinued long-term collective bargaining over terms and conditions of employment. The Players argued in the district court that the Norris–LaGuardia Act does not preclude a court from enjoining a group boycott, citing *Boise Cascade International, Inc. v. Northern Minnesota Pulpwood Producers Ass'n,* 294 F.Supp. 1015 (D.Minn.1968). The district court rejected the Players' argument, because the dispute enjoined in *Boise Cascade* "was not a controversy over the terms and conditions of employment, but a dispute over the sale of commodities.... Each of the cases [cited in *Boise Cascade*] rejected application of the Norris–LaGuardia Act because the disputes did not concern labor, but the sale of goods." *Brady,* —— F.Supp.2d at —— n. 44, 2011 WL 1535240, at *24 n. 44.

The district court reasoned that this case does not involve or grow out of a labor dispute because the Players no long-

er are represented by a union. *See id.* at ——, 2011 WL 1535240, at *24. We have considerable doubt about this interpretation of the Act. The plain language of the Act states that a case involves or grows out of a labor dispute when it is "between one or more employers or associations of employers and *one or more employees or associations of employees.*" 29 U.S.C. § 113(a)(1) (emphasis added). The Act does not specify that the employees must be members of a union for the case to involve or grow out of a labor dispute.

The Supreme Court decision most closely on point did not limit the Act to disputes involving a union. In *New Negro Alliance v. Sanitary Grocery Co.,* 303 U.S. 552, 58 S.Ct. 703, 82 L.Ed. 1012 (1938), a company sought an injunction against the New Negro Alliance, "a corporation composed of colored persons, organized for the mutual improvement of its members and the promotion of civic, educational, benevolent, and charitable enterprises." 303 U.S. at 555, 58 S.Ct. 703. The Alliance allegedly had conspired to picket and boycott one of the company's grocery stores to pressure the store to employ African–American clerks. The company claimed, among other things, that the Alliance's acts were "unlawful, [and] constitute[d] a conspiracy in restraint of trade." *Id.* at 558–59, 58 S.Ct. 703. The district court granted an injunction against the Alliance. The court of appeals affirmed, specifically holding the Norris–LaGuardia Act inapplicable. *See* 92 F.2d 510, 512–13 (D.C.Cir.1937).

The Supreme Court reversed. Although no labor organization was involved in the dispute, the Court ruled that the definitions in the Act "plainly embrace the controversy which gave rise to the instant suit and classify it as one arising out of a dispute defined as a labor dispute." 303 U.S. at 560, 58 S.Ct. 703. The Court viewed the dispute as one involving "conflicting or competing interests in a 'labor dispute' of 'persons participating or interested' therein," *id.,* and further indicated that the Act also embraces controversies "between employers and employees," as well as those between "labor unions seeking to represent employees and employers[,] and between persons seeking employment and employers." *Id.* at 560–61, 58 S.Ct. 703. The Act's text and the Supreme Court's interpretation of it raise serious questions about the district court's conclusion that the Norris–LaGuardia Act does not prohibit or condition injunctions "absent the present existence of a union." *Brady,* —— F.Supp.2d at ——, 2011 WL 1535240, at *24.

The Act's prohibition on injunctions, moreover, is not limited to cases "involving" a labor dispute. The Act's prohibition also covers cases "growing out of" a labor dispute. For several years, through March 11, 2011, the League and the Players' union were parties to a collective bargaining agreement. *See id.* at ——–——, 2011 WL 1535240, at *5–6. For approximately two years, through March 11, the League and Players' union were engaged in collective bargaining over terms and conditions of employment. *See id.* at ——, 2011 WL 1535240, at *6. When that bargaining failed to produce an agreement on disputed employment terms, and the League's lockout loomed, the union disclaimed its status as the Players' representative on March 11, and the Players filed this antitrust action on March 11. *See id.* at ——–——, 2011 WL 1535240, at *6–7. In this action—filed the same day the union discontinued collective bargaining—the Players seek relief concerning terms and conditions of employment. Given the close temporal and substantive relationship linking this case with the labor dispute between League and the Players' union, we struggle at this juncture to see why this case is not at least one "growing out of a

labor dispute"—even under the district court's view that union involvement is required for a labor dispute.

The Players defend the district court's decision on an alternative ground that the Norris–LaGuardia Act does not prohibit injunctions against a lockout by an employer. The most apposite authorities support the view that the Act bars injunctions against lockouts by employers. *See Chi. Midtown Milk Distribs., Inc. v. Dean Foods Co.*, 1970 WL 2761, at * 1 (7th Cir. July 9, 1970) (per curiam); *Clune v. Publishers' Ass'n of New York City*, 214 F.Supp. 520, 528–29 (S.D.N.Y.), *aff'd*, 314 F.2d 343, 344 (2d Cir.1963) (mem.) (per curiam); *Plumbers & Steamfitters Local 598 v. Morris*, 511 F.Supp. 1298, 1311 (E.D.Wash.1981). Because the phrase "remain in any relation of employment" naturally applies to employers as well as employees, we are not inclined to disagree with these decisions. *See* 29 U.S.C. § 104(a).

The Players suggest that section 104(a)—forbidding a district court to enjoin any person from "refusing ... to remain in any relation of employment"— applies only to injunctions against workers, and exists only to clarify that the Act covers both temporary strikes and permanent cessations of employment. The Players note that the quoted phrase was drawn from Section 20 of the Clayton Act, which "was specifically intended ... 'to guard the right of workingmen to act together in terminating, if they desire, any relation of employment.'" *Local 2750, Lumber & Sawmill Workers Union v. Cole*, 663 F.2d 983, 986 n. 5 (9th Cir.1981) (quoting S.Rep. No. 63–698, at 51 (1914)); *see also de*

*Arroyo v. Sindicato de Trabajadores Packinghouse*, 425 F.2d 281, 291–92 (1st Cir.1970).

Our present view is that this interpretation of the Act is unlikely to prevail. As both the D.C. Circuit and the Second Circuit have observed, although Congress "'was largely concerned with the effect of [federal court] interference on unions, the [Clayton Act] was phrased in an evenhanded fashion to protect employer conduct in labor disputes as well as that of unions.'" *Brown v. Pro Football Inc.*, 50 F.3d 1041, 1055 (D.C.Cir.1995) (quoting *Nat'l Basketball Ass'n v. Williams*, 45 F.3d 684, 689 (2d Cir.1995)), *aff'd*, 518 U.S. 231, 116 S.Ct. 2116, 135 L.Ed.2d 521 (1996). The Norris–LaGuardia Act retained that evenhanded phrasing by precluding an injunction that prohibits "any persons participating or interested in a labor dispute" from refusing to remain in a relation of employment. 29 U.S.C. § 104(a).*

In sum, we have serious doubts that the district court had jurisdiction to enjoin the League's lockout, and accordingly conclude that the League has made a strong showing that it is likely to succeed on the merits.

We next consider what injury to the parties is likely to arise from this court's grant or denial of the motion for a stay, and how the public interest would be affected by this court's decision on the motion. The Players argue that they are suffering irreparable harm as a result of the lockout, and that the grant of a stay pending appeal would subject them to continuing injury. They contend that even if the court decides this case during the NFL off-season, they are injured irrepara-

---

* We further observe that even if section 104(a) of the Act were construed to permit an injunction against an employer lockout, there is a serious question whether the district court complied with the procedural requirements of the Act—including to hold a hearing in open court with opportunity for cross-examination—before issuing an injunction. *See* 29 U.S.C. § 107; *cf. Mackey*, 543 F.2d at 623.

bly by an inability to participate in off-season practice and classroom sessions, to learn their teams' playbooks, to undergo team-supervised medical procedures and evaluations, and to work out at team facilities. They emphasize that nearly 900 players are free agents without contracts, and that the lockout deprives them of a competitive market through which they can pursue their careers. The Players argue that every day of a lockout increases the chance that the 2011 season will be cancelled or significantly shortened, because teams must sign free agents and rookies in order to finalize their rosters. Because the career of a professional football player is typically short, they assert that the loss of even one season of competition is very detrimental.

■ The League contends that it is irreparably harmed by the district court's injunction, because its ability to maintain the lockout is essential to the League's negotiating position in an ongoing dispute with the Players, and that there is no way to measure and compensate the League for its loss of leverage and consequent delay if the injunction is not stayed. *See Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers v. Pauly Jail Bldg. Co.*, 118 F.2d 615, 616–17 (8th Cir.1941) ("The fact must not be lost sight of, that however narrow the scope of injunctive relief may be in form, the issuance of the writ for any purpose in a labor dispute will generally tip the scales of the controversy."). The NFL observes that this court, in a different context, has recognized irreparable harm based on the impossibility of recreating a negotiating environment that a stay pending appeal was designed to preserve. *Iowa Util. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir.1996); *see also Dynamic Solutions, Inc. v. Planning & Control, Inc.*, 646 F.Supp. 1329, 1337 (S.D.N.Y. 1986) (copyright-holder deprived of exclu-sive use satisfied irreparable harm requirement, because "[t]he monetary worth of that leverage in ... negotiations would be difficult, at best, to determine."). The League also maintains that player transactions that will occur under the injunction—trades, free agent signings, and roster cuts of players under contract—will cause irreparable harm to the League if the district court's order is not stayed, because it will be impossible to restore the status quo as of April 25 after contracts are formed and transactions completed during the processing of an appeal.

Both sides raise valid points, and this is a case in which one party or the other likely will suffer some degree of irreparable harm no matter how this court resolves the motion for a stay pending appeal. We do not agree, however, with the district court's apparent view that the balance of the equities tilts heavily in favor of the Players. The district court gave little or no weight to the harm caused to the League by an injunction issued in the midst of an ongoing dispute over terms and conditions of employment. The court found irreparable harm to the Players because the lockout prevents free agents from negotiating contracts with any team, but gave no weight to harm that would be caused to the League by player transactions that would occur only with an injunction against the lockout. The court gave full weight to affidavit evidence submitted by the Players, although that proof was untested by cross-examination at a hearing. *Cf.* 29 U.S.C. § 107. The district court's analysis was conducted without the benefit of knowledge that this appeal will be submitted for decision on a highly expedited schedule—a circumstance that should minimize harm to the Players during the off-season and allow the case to be resolved well before the scheduled beginning of the 2011 season.

■ As to the fourth factor in our analysis, the public interest surely favors some resolution between the parties that will permit professional football to be played in 2011, but in this legal context, we see no reason to differentiate between the public interest and the proper application of the federal law regarding injunctions. In sum, we think the League has met its burden to demonstrate that it likely will suffer some degree of irreparable harm without a stay, and the balance of the equities does not favor the Players so decidedly that it should outweigh our present view about likelihood of success on the merits.

For these reasons, the district court's order of April 25, 2011, is stayed pending the final disposition of this expedited appeal. The temporary stay imposed by our order of April 29, 2011, is dissolved, and it is replaced by the stay imposed by the terms of this order.

BYE, Circuit Judge, dissenting.

I respectfully dissent from the majority's decision to grant the NFL's motion for a stay pending appeal. "A stay is an intrusion into the ordinary processes of administration and judicial review, . . . and accordingly is not a matter of right, even if irreparable injury might otherwise result to the appellant." *Nken v. Holder,* —— U.S. ——, 129 S.Ct. 1749, 1757, 173 L.Ed.2d 550 (2009) (internal quotation marks and citation omitted). Because the present case does not present circumstances warranting such an intrusion, I would deny the NFL's motion for a stay pending the final disposition of this expedited appeal.

My analysis is guided by the four factors we consider in determining whether to grant a stay:

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Id.* at 1756 (internal quotation marks and citation omitted); *see also Reserve Mining Co. v. United States,* 498 F.2d 1073, 1076–77 (8th Cir.1974). The NFL, as the party seeking a stay, bears the burden of proving these factors. *Lankford v. Sherman,* 451 F.3d 496, 503 (8th Cir.2006).

First, in analyzing the above factors, this court has recognized that "[r]egardless of the strength of its claim on the merits, a movant for a [stay pending appeal] should show a threat of irreparable harm." *Cf. Rogers Group, Inc. v. City of Fayetteville, Ark.,* 629 F.3d 784, 789 (8th Cir.2010) (internal quotation marks and citation omitted); *see also S & M Constructors, Inc. v. Foley Co.,* 959 F.2d 97, 98 (8th Cir.1992) (per curiam) (noting we consider the same factors in determining a stay pending appeal as we consider for a preliminary injunction). "Failure to show irreparable harm is an independently sufficient ground upon which to deny a [stay]." *Rogers Group, Inc.,* 629 F.3d at 789 (internal quotation marks and citation omitted). With this in mind, I will first address the balance of equities between the parties before reaching the likelihood of success on the merits.

"In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utils. Bd. v. FCC,* 109 F.3d 418, 425 (8th Cir.1996). Stated differently, the irreparable harm alleged by the NFL "must be actual and not theoretical." *Packard Elevator v. ICC,* 782 F.2d 112, 115 (8th Cir.1986). Moreover, the NFL cannot meet its burden if it demonstrates only economic loss, unless

"the loss threatens the very existence of the [NFL's] business," because "economic loss does not, in and of itself, constitute irreparable harm." *Id.* "Implicit in each of these principles is the further requirement that the [NFL] substantiate the claim that irreparable injury is 'likely' to occur ... [by] provid[ing] proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future." *Id.*

As an initial matter, it is difficult to discern which of the NFL's allegations of irreparable harm the majority relied upon in its decision. After setting forth the parties' arguments, the majority confined its analysis on this point to acknowledging, "[b]oth sides raise valid points." Ante at 793. The majority also faulted the district court for giving "little or no weight to the harm caused to the League by an injunction issued in the midst of an ongoing dispute over terms and conditions of employment," although it once again did not speak to what harm it was referring. Moreover, the majority's allusion to "an injunction issued in the midst of an ongoing dispute over terms and conditions of employment" ignores the context of the parties' current collective bargaining disposition and treats the disclaimer of the union as if it never happened. *See* Stay Order at 9 ("This contention assumes that both parties view the negotiations as being at impasse in the collective bargaining process. But the Players do not believe there is a collective bargaining process in place.").

Notwithstanding the majority's analysis, the NFL has not persuaded me it will suffer irreparable harm during the pendency of this expedited appeal. First, the NFL contends the injunction issued by the district court deprives the NFL of its labor law right to lock out the Players. The resulting effect of this, according to the NFL, is to skew the collective bargaining process in the Players' favor. As will be discussed more fully below, it is doubtful the NFL enjoys its alleged "labor law right to impose a work stoppage" under the present circumstances where the parties are no longer engaged in the collective bargaining process. In any event, there will not be any shift in the "balance of power" until the appeal is resolved. Indeed, the NFL itself acknowledges, "[a]ll that is relevant here is the injury, if any, that the [parties] would suffer in the time necessary for this Court to consider a highly expedited appeal during the offseason." Appellant's Brief at 20. Given that the parties will not likely return to the bargaining table prior to our resolution of this expedited appeal, at which point we will determine whether the district court properly enjoined the lockout, the NFL's claim that it will suffer a loss of bargaining power in this interim period does not amount to "proof indicating that the harm is certain to occur in the near future" for purposes of a stay pending appeal. *Id.*

Next, the NFL asserts it will be unable to "unscramble the egg" of player transactions occurring in the absence of a stay. The NFL also argues, in the absence of a stay, its clubs will be required to "produce their inherently joint and collective product," which in turn will subject the League to further antitrust claims by the Players. Each of these arguments is questionable given the current juncture of affairs. The preliminary injunction does not dictate the NFL's free agency rules, or any other conduct in general, outside of the lockout. Moreover, the fact the NFL must comply with the law, i.e., the Sherman Act, does not constitute irreparable harm—it is the absolute minimum that could be expected of the League.

Whatever harm may be said to befall the NFL during the pendency of the expedited

appeal stands in stark contrast to the irreparable harm suffered by the Players. Regardless of the preclusion of free agency effectuated under the lockout and its influence on the Players, there can be little dispute that the off-season is an abundantly busy period for veterans and rookies alike. *See* Supplemental Declaration of Richard A. Berthelsen at 14 ("The facts are that the NFL has increasingly become a year-round business over the past twenty years, with players participating at many important club activities during this time of the so-called 'off-season.'"). Even the brief stay occasioned during this expedited appeal will deprive the Players of "irreplaceable opportunities to develop their skills as football players and to otherwise advance their NFL careers." Declaration of Joby Branion at 2–3. For instance, the recently-drafted rookie players are presently forestalled from practicing with their new teams and accessing their team's gameplan and coaching staff, which could cost these players the opportunity to become starting players or even make the team. *Id.* at 3; *see also* Supplemental Declaration of Richard A. Berthelsen at 15 ("These players are among the most vulnerable and cannot afford to be held back with weeks or months of inactivity when they will have to compete against already established players competing for the same jobs."). "A young athlete's skills diminish and sometimes are irretrievably lost unless he is given an opportunity to practice and refine such skills at a certain level of proficiency." *Neeld v. Am. Hockey League,* 439 F.Supp. 459, 461 (W.D.N.Y. 1977).

Similarly, the veteran players are subject to the demands of constantly proving their worth in the NFL. Declaration of Frank Bauer at 5 ("The virtually constant need for NFL players to prove their skill and value on both the game and practice fields makes a 'lockout' especially problematic."). It is of little surprise that professional athletes must undergo rigorous off-season workouts, study playbooks, and meet with coaches and team officials to assiduously prepare for the upcoming season. *See* Supplemental Declaration of Richard A. Berthelsen at 14 ("[T]he off-season would normally be comprised of up to 14 weeks of practice activity as well as classroom sessions where players spend valuable time with their coaches learning their club's offensive and defensive systems. Players are constantly working out at club facilities, under the supervision of club personnel who are constantly evaluating players. Players also undergo club supervised medical procedures and evaluations during the off-season."). It follows that even the abbreviated harm fashioned by the stay will obviate the Players' opportunities to engage in any of these off-season necessities, which could have dramatic repercussions to the Players' careers in the long term. Further, none of this harm can be adequately compensated by monetary damages. *See Rogers Group, Inc.,* 629 F.3d at 789 ("Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages.") (internal quotation marks and citation omitted).

Due to the irreparable harm presently incurred by the Players, compared with the limited harm, if any, suffered by the NFL, I believe the balance of harms weighs heavily in the Players' favor. Consequently, I would require the NFL to satisfy a heavier burden of showing it is likely to prevail on the merits. *See Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109, 113 (8th Cir.1981) (en banc) ("If the chance of irreparable injury to the movant should relief be denied is outweighed by the likely injury to other parties litigant should the injunction be granted, the mov-

ing party faces a heavy burden of demonstrating that he is likely to prevail on the merits.").

In analyzing the merits, it becomes readily apparent that the NFL fails to satisfy its burden. I disagree with the majority's assessment of the merits of the NFL's position concerning the applicability of the Norris–LaGuardia Act. It is true the Act deprives federal courts of jurisdiction to grant injunctive relief in "case[s] involving or growing out of a labor dispute," 29 U.S.C. § 101, and specifically prevents injunctions prohibiting "[c]easing or refusing to perform any work or to remain in any relation of employment," 29 U.S.C. § 104(a). It is also true the Act is phrased in intentionally broad terms, *Jacksonville Bulk Terminals, Inc. v. ILA*, 457 U.S. 702, 708, 102 S.Ct. 2672, 73 L.Ed.2d 327 (1982), and contains an expansive definition of the term "labor dispute." *See* 29 U.S.C. § 113(c). But in interpreting these provisions, the majority loses sight of the principal purpose behind the enactment of the Act, *see Kasten v. Saint–Gobain Performance Plastics Corp.*, — U.S. —, 131 S.Ct. 1325, 1330, 179 L.Ed.2d 379 (2011) (stressing the importance of purpose and context of the statute in conducting statutory analysis), and, as a result, manages to use "benefits to organized labor … as a cat's-paw to pull employers' chestnuts out of the antitrust fires." *United States v. Women's Sportswear Mfg. Ass'n*, 336 U.S. 460, 464, 69 S.Ct. 714, 93 L.Ed. 805 (1949).

The legislative history of the Act reveals that Congress enacted it in response to the Supreme Court's decision in *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921), where the Court refused to extend a similar anti-injunction provision in the Clayton Act to secondary activity—i.e., activity where union pressure is directed against third parties rather than the employees' own employer. *Burlington N. R.R. Co. v. Bhd. of Maintenance of Way Employees*, 481 U.S. 429, 438, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987). Congress felt the unduly narrow construction of the law in *Duplex Printing* and the pattern of injunctions entered by federal judges deliberately flouted the expression of its will in the Clayton Act. *See* Michael C. Duff, Labor Injunctions in Bankruptcy: The Norris–LaGuardia Firewall, 2009 Mich. St. L.Rev. 669, 678 n. 39 (2009). To redress this problem, Congress took care to "greatly broaden[ ] the meaning … attributed to the words 'labor dispute,' further restrict[ ] the use of injunctions in such a dispute, and emphasize[ ] the public importance under modern economic conditions of protecting the rights of employees to organize into unions and to engage in 'concerted activities for the purpose of collective bargaining or other mutual aid or protection.'" *Allen Bradley Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers*, 325 U.S. 797, 805, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945). All of that was, of course, done ostensibly to "stay[ ] the hands of courts whose creativity had been employed in the service of management," *Burlington N. R.R. Co. v. Bhd. of Maintenance of Way Employees*, 793 F.2d 795, 806 (7th Cir.1986), and "to protect the rights of labor," *United Mine Workers of Am. v. Pennington*, 381 U.S. 676, 703 n. 4, 85 S.Ct. 1607, 14 L.Ed.2d 626 (1965) (internal citation omitted).

Evaluated against this backdrop, the Act must be understood to apply to an increasingly broad *number of actors* in a labor dispute. For example, the language of the Act making it applicable to "case[s] involving or *growing out of* a labor dispute" ensures that courts do not enjoin secondary activity related to collective bargaining, even if the secondary employer is not substantially aligned with the primary employer. *See Burlington Northern Rail-*

road Co., 793 F.2d at 805–06. Similarly, Section 4(a)'s ban on injunctions against "[c]easing or refusing to perform any work or *to remain in any relation of employment*" clarifies that "employee strikes could not be enjoined either if the employees claimed to have ceased or refused to work temporarily or if they claimed to have completely ended their employment relation with their employer." *de Arroyo v. Sindicato de Trabajadores Packinghouse, AFL–CIO,* 425 F.2d 281, 291 (1st Cir.1970), disapproved on other grounds, *Bowen v. U.S. Postal Serv.,* 459 U.S. 212, 220 n. 8, 103 S.Ct. 588, 74 L.Ed.2d 402 (1983); *see also Local 2750, Lumber & Sawmill Workers Union, AFL–CIO v. Cole,* 663 F.2d 983, 986 n. 5 (9th Cir.1981). Finally, the broad language of the Act has been construed to encompass disputes "grounded in noneconomic motives," such as disagreements with the employer's policies. *See Cent. Vermont Ry., Inc. v. Bhd. of Maintenance of Way Employees,* 793 F.2d 1298, 1301 (D.C.Cir.1986) (citing *Jacksonville Bulk Terminals, Inc.,* 457 U.S. at 713–15, 102 S.Ct. 2672, and *New Negro Alliance v. Sanitary Grocery Co.,* 303 U.S. 552, 560, 58 S.Ct. 703, 82 L.Ed. 1012 (1938)).

Yet, despite the widening circle of actors eligible for protection under the Act, the law remains focused on safeguarding the collective bargaining process. Recognizing that unions are, by their very nature, groups of people acting together in restraint of free competition and trade, *see Pennington,* 381 U.S. at 666, 85 S.Ct. 1585, the Act strikes a delicate balance between " 'the congressional policy favoring collective bargaining under the NLRA and the congressional policy favoring free competition in business markets.' " *Brown v. Pro Football, Inc.,* 50 F.3d 1041, 1048 (D.C.Cir. 1995) (quoting *Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100,* 421 U.S. 616, 622, 95 S.Ct. 1830, 44

L.Ed.2d 418 (1975)). By suspending antitrust liability, the Act protects "working men in the exercise of organized, economic power, which is vital to collective bargaining." *Bhd. of R.R. Trainmen v. Chicago River & Ind. R.R. Co.,* 353 U.S. 30, 40, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957). Unless the values of collective bargaining are implicated, federal labor laws yield to the regular antitrust framework. *See Powell v. NFL,* 930 F.2d 1293, 1303 (8th Cir.1989). The question becomes, then, whether the Act shields from antitrust liability the actions of the NFL *even after* the NFLPA had disclaimed its role as the Players' collective bargaining representative and the Players voted to end the NFLPA's status as their representative.

In my opinion, the answer to this question lies in the Supreme Court's decision in *Brown v. Pro Football, Inc.,* 518 U.S. 231, 116 S.Ct. 2116, 135 L.Ed.2d 521 (1996), where the Court analyzed the applicability of the nonstatutory labor exemption from antitrust liability where parties reach a significant impasse in negotiations. Although the Court ultimately concluded the employer was entitled to the nonstatutory labor exemption in that case, the Court hypothesized that "an agreement among employers could be sufficiently distant in time and in circumstances from the collective-bargaining process that a rule permitting antitrust intervention would not significantly interfere with that process." *Id.* at 250, 116 S.Ct. 2116. As one example of such a sufficiently distant event, the Court cited a "collapse of the collective-bargaining relationship, as evidenced by decertification of the union." *Id.*; *Brown,* 50 F.3d at 1057 ("If employees wish to seek the protections of the Sherman Act, they may forego unionization or even decertify their unions."); *see also NBA v. Williams,* 857 F.Supp. 1069, 1078 (S.D.N.Y.1994) (pre-

dicting the players can avoid the labor injunction if they disclaim the union as their collective bargaining agent); *Powell v. NFL*, 764 F.Supp. 1351, 1356–57 (D.Minn.1991) (holding that the ongoing collective bargaining relationship ends, and the nonstatutory labor exemption no longer applies, when the players vote to repudiate the union). When the union no longer represents employees, collective bargaining comes to a definitive halt, and labor laws are no longer implicated. *See generally* Phillip Lawrence Wright, Jr., Major League Soccer: Antitrust, the Single Entity, and the Heightened Demand for a Labor Movement in the New Professional Soccer League, 10 Seton Hall J. Sport L. 358, 386 (2000) (stating that, "when a union decertifies, the collective bargaining relationship between the players and owners (or league) ends because the union no longer represents the players" and the players regain the ability to sue under the Sherman Act).

Since the statutory and the nonstatutory labor exemptions are actuated by the same policies concerning the antitrust-labor balance, the Court's language in *Brown* is indicative of the outer limits of their application. It would be illogical to reject the nonstatutory labor exemption upon union disclaimer, yet prohibit the court from remedying antitrust violations through injunctive relief. *Brown* suggests that, with the collapse of the union, labor laws are no longer in force and the preexisting antitrust rights apply. By disassociating themselves from the union, the players make a choice in favor of the antitrust framework at the expense of foregoing the protections of labor laws. *Brown*, 50 F.3d at 1057. This is a *quid pro quo* they are entitled to make. *See* 29 U.S.C. § 157 (describing employees' right to self-organization, including "the right to refrain from" joining labor organizations). Refusing to attribute proper significance to the

fact of the union disclaimer would lead to "the bizarre prospect of employers attempting to force employees to remain in a union so as to preserve the employers' valuable antitrust exemption." *Brown*, 50 F.3d at 1065 (Wald, J., dissenting) (describing the NFL's suit seeking judicial invalidation of the union disclaimer by the players). It would also hold the Players in limbo for an indeterminate period of time, during which they can neither take advantage of their collective bargaining rights nor avail themselves of protections of antitrust law.

In support of its argument that existence of a labor union is irrelevant for the purpose of the Norris–LaGuardia Act, the majority cites the 1938 decision of the Supreme Court in *New Negro Alliance v. Sanitary Grocery Co.*, where the Court applied the Act to lift an injunction against a civil rights organization protesting discriminatory policies of the employer. Carefully read, however, the case does not stand for the proposition for which the majority cites it. To begin with, *New Negro Alliance* did not answer the precise question at issue before this court—the applicability of the Norris–LaGuardia Act post-disclaimer. Rather, the issue there was whether the terms and conditions of employment had to be economic in nature, or could also relate to the employer's non-economic policies. *Jacksonville Bulk Terminals, Inc.*, 457 U.S. at 714, 102 S.Ct. 2672. The opinion also reaffirmed the familiar principle that the disputants need not "stand in the relationship of employer and employee" to fall within the ambit of the Act. *Id.* Nowhere in the opinion did the Court discuss the applicability of the Act in the absence of collective bargaining, not to mention its applicability following a definitive disclaimer of the union representation. Because the Supreme Court certainly did not "squarely address" the rele-

vant issue, this court is not bound by any *sub silentio* holding the majority seeks to infer. *Brecht v. Abrahamson*, 507 U.S. 619, 631, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

Indeed, *New Negro Alliance* does not mention the existence of any collective bargaining relationship whatsoever. By logical extension, then, the majority would jettison the requirement of having any connection to the collective bargaining process altogether and thereby extend the Act's strictures to virtually any employment discrimination dispute. Such result is demonstrably untenable. *See Stearns v. NCR Corp.*, 297 F.3d 706, 710 (8th Cir. 2002) ("In general, an employment contract between an employer and a nonunion employee is governed by state law, not by . . . the federal labor laws."). In addition, *New Negro Alliance* remains in conflict with the Supreme Court's suggestion in *Brown* that at some point, the breakdown of the collective bargaining process tips the balance between labor and antitrust laws in favor of the latter. Instead of accepting a simple, clear-cut line of demarcation suggested by *Brown*—upon dissolution of the union—the majority indulges in the fiction that collective bargaining continues for some undefined period following the disclaimer.

In sum, because I believe the Norris–LaGuardia Act does not apply in a situation where the Players are no longer represented by the union, I would conclude the NFL did not make the necessary strong showing of likelihood of success on the merits. Moreover, as it relates to the fourth factor, the NFL's failure to make the necessary showing on the merits detracts from the NFL's argument that the public interest favors the application of labor laws in the current context. At best, when considering the public interest in having a 2011 NFL season and, by exten-

sion, continuing with normal operations necessary for that objective, the public interest factor is a wash. Taken in conjunction with the balance of harms, which clearly favors the Players during the pendency of the expedited appeal, I would deny the NFL's motion for a stay.

I respectfully dissent.