# United States Court of Appeals

### For the Eighth Circuit

_____

No. 20-3126

_____

Angela Craig; Jenny Winslow Davies,

*Plaintiffs - Appellees,*

v.

Steve Simon, in his official capacity as Minnesota Secretary of State,

*Defendant,*

Tyler Kistner,

*Intervenor Defendant - Appellant.*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: October 16, 2020
Filed: October 23, 2020

_____

Before LOKEN, COLLOTON, and BENTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

We consider here a motion for stay of an injunction entered by the district court in a dispute relating to the general election scheduled for November 3, 2020. The appellant, Tyler Kistner, is the candidate of the Republican Party for the United States House of Representatives in the Second Congressional District of Minnesota. Appellee Angela Craig is the incumbent Representative and the candidate of the Democratic-Farmer-Labor Party for that office. Appellee Jenny Winslow Davies is a voter in the district.

The dispute arises from the death of a third candidate in the race, Adam Weeks, on September 21, 2020. Weeks was the candidate of the Legal Marijuana Now Party, which is recognized as a "major political party" under Minnesota law. Minnesota law accords "major" party status to the LMN Party because the party's candidate for state auditor received at least five percent of the statewide vote in 2018. *See* Minn. Stat. § 200.02, subd. 7(a)(1).

The lawsuit concerns the validity of a Minnesota statute that addresses the administration of an election when a candidate of a "major political party" dies after the seventy-ninth day before the general election. As applicable here, the statute provides that "the general election ballot shall remain unchanged, but the county and state canvassing boards must not certify the vote totals for that office from the general election, and the office must be filled at a special election held in accordance with this section." Minn. Stat. § 204B.13, subd. 2(c). The section continues that the governor "shall issue a writ calling for a special election to be conducted on the second Tuesday in February of the year following the year the vacancy in nomination occurred"—in this case, February 9, 2021. *Id.* § 204B.13, subd. 7.

Craig maintains that the Minnesota statute is preempted by federal law. The Constitution provides that Congress may regulate the time of elections for

Representatives, U.S. Const. art. I, § 4, cl.1, and this Election Clause confers "the power to pre-empt." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 14 (2013). States have responsibility "for the mechanics of congressional elections, but only so far as Congress declines to preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997) (internal citation omitted).

A federal statute provides that the day for election of Representatives is "[t]he Tuesday next after the 1st Monday in November, in every even numbered year." 2 U.S.C. § 7. But another section, at issue here, authorizes the States to prescribe "the time for holding elections in any State . . . for a Representative . . . *to fill a vacancy*, whether such vacancy is *caused by a failure to elect at the time prescribed by law*, or by the death, resignation, or incapacity of a person elected." *Id*. § 8(a) (emphases added).

The crux of the dispute is whether Minnesota has authority under § 8(a) to schedule a special election for February 2021 "to fill a vacancy" that will be "caused by a failure to elect at the time prescribed by law," that is, on November 3, 2020. The State's position is that because Minn. Stat. § 204B.13 provides that the canvassing boards must not certify the vote totals from November 3 in light of candidate Weeks's death, there will be a "failure to elect" a Representative "at the time prescribed by law," and the State may thus prescribe the time for an election to fill the vacancy.[1]

_____

[1]The Minnesota Secretary of State defended the state statute in the district court. In response to the motion for a stay pending appeal, he says that he disagrees with the district court's preliminary determination, but nonetheless opposes a stay of the injunction, because it would result in "voter confusion and consequent incentive to remain away from the polls." *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (per curiam). We do not rely on the Secretary's rationale, because a stay would allow the state statute to take effect, and permit the election for Representative to occur in February 2021 rather than November 2020. In that case, any current confusion among voters about the effect of a vote for Representative in November 2020 would be largely immaterial.

The district court ruled that the Minnesota statute is likely preempted, ordered that § 204B.13 must not be enforced as to the election on November 3 for Representative from the Second District, and enjoined the Minnesota Secretary of State from refusing to give legal effect to the ballots cast for Representative on November 3. (The court also enjoined the Secretary of State from communicating to voters that their ballots will not be counted.) The district court reasoned that the State "cannot *invent* a failure to elect or *create* an exigent circumstance by refusing to certify the vote totals for Minnesota's Second Congressional District." The court rejected the State's position that a failure to elect will arise from candidate Weeks's death, and concluded that "the death of a candidate, without more, does not inevitably result in a failure to elect a representative." The court allowed, however, that if "Weeks were to posthumously win the November 3, 2020 general election, it is possible that a 'failure to elect' will have occurred."[2]

Kistner argues that we should stay the district court's injunction, because he will suffer irreparable harm without a stay, he is likely to succeed on the merits of an appeal, and he satisfies the other criteria for a stay pending appeal. *See Brady v. NFL*, 640 F.3d 785, 789 (8th Cir. 2011) (per curiam). Kistner maintains that Minnesota is

_____

[2]Some States provide that if a candidate dies, then the election will proceed, and if the decedent receives more votes than any living candidate, then the decedent will be "deemed" or "considered" elected, and a vacancy will arise at the beginning of the new term in the following January. *See* Cal. Elec. Code § 15402(b); Conn. Gen. Stat. § 9-460; Haw. Rev. Stat. § 11-118(c)(2); Md. Code Ann. Elec. Law § 5-1302(b); Mo. Rev. Stat. § 115.379.1; Nev. Rev. Stat. § 293.368(3)-(4); N.Y. Elec. Law § 6-150; Okla. Stat. tit. 26, § 1-105(C); Tenn. Code Ann. § 2-5-204(e); Tex. Elec. Code Ann. § 145.005; Wis. Stat. § 8.35(3); Wyo. Stat. Ann. § 22-18-101(d). Minnesota law does not include such a provision, and we express no view on whether a State may "deem" a deceased person elected to office, whether a majority vote for a deceased person would result in a "failure to elect" under 2 U.S.C. § 8(a), or whether the living person who receives the most votes would be elected to office. *See also* U.S. Const. art. I, § 5, cl. 1 (providing that "[e]ach House shall be the Judge of the Elections, Returns and Qualifications of its own Members").

permitted to make a policy choice that "an election compromised by the untimely and unforseen withdrawal or death of a major-party candidate is not sufficiently indicative of popular will to bind Minnesota." As such, he contends, the State may declare invalid the election on November 3, and then schedule a special election to fill a vacancy that will be caused by a failure to elect on the originally scheduled date.

The Minnesota statutory provision at issue was enacted in 2013. The legislative history suggests that it was prompted in part by the election of 2002, during which a candidate for United States Senator, Paul Wellstone, died on October 25. In that election, the Democratic-Farmer-Labor party substituted a new candidate who competed in the general election, although some absentee ballots already cast were counted for Wellstone. Many States still provide for substitution of a candidate on the November ballot in the event of a death.[3] The legislative record in Minnesota, however, suggests that the substitution of candidates as an election date approaches may be complicated by the need to reprogram accessible voting equipment required by the Help America Vote Act, 52 U.S.C. § 21081(a)(3)(A)-(B), a 45-day minimum

---

[3]*See* Ala. Code § 17-13-23; Alaska Stat. § 15.25.110; Ariz. Rev. Stat. § 16-343; Ark. Code Ann. §§ 7-1-101(37)(A), 7-7-104; Colo. Rev. Stat. § 1-4-1005; Conn. Gen. Stat. § 9-460; Del. Code Ann. tit. 15, § 3306; Ga. Code Ann. §§ 21-2-134(b)-(f), 21-2-289; Haw. Rev. Stat. § 11-118; Idaho Code § 34-715; 10 Ill. Comp. Stat. Ann. 5/7-61; Ind. Code §§ 3-13-2-1, -3; Iowa Code § 43.78; Kan. Stat. Ann. § 25-3905(a); Ky. Rev. Stat. Ann. § 118.105(3), (5)-(6); Md. Code Ann. Elec. Law § 5-1003; Mass. Gen. Laws ch. 53, § 14; Mich. Comp. Laws § 168.139; Miss. Code Ann. § 23-15-317; Mo. Rev. Stat. § 115.363.3; Mont. Code Ann. § 13-10-327; Neb. Rev. Stat. § 32-627; N.H. Rev. Stat. Ann. § 655:39; N.J. Stat. Ann. § 19:13-20; N.M. Stat. Ann. § 1-8-8; N.Y. Elec. Law § 6-148; N.C. Gen. Stat. § 163-114; N.D. Cent. Code § 16.1-11-18(4)-(6); Ohio Rev. Code Ann. § 3505.01(B); Okla. Stat. tit. 26, § 1-105(A)-(B); Or. Rev. Stat. § 249.190; 25 Pa. Cons. Stat. § 2939; 17 R.I. Gen. Laws § 17-15-38(a); S.C. Code Ann. § 7-11-55; S.D. Codified Laws § 12-6-56; Tenn. Code Ann. § 2-13-204; Utah Code Ann. § 20A-1-501(1); Vt. Stat. Ann. tit. 17, § 2381; Va. Code Ann. § 24.2-539; W.Va. Code § 3-5-19(a)(7); Wis. Stat. § 8.35(2); Wyo. Stat. Ann. § 22-5-401(a)-(b).

window for transmitting absentee ballots under the Military and Overseas Voter Empowerment Act, 52 U.S.C. § 20302(a)(8)(A), and the dilemma of how to count absentee votes already cast for the decedent by voters who would not have an opportunity to consider a substituted candidate.[4] *See* Minn. House of Reps., 88th Sess., Comm. on Elecs., Recording of Fourth Meeting (Jan. 24, 2013), https://www.house.leg.state.mn.us/Committees/minutes/88008/4649; Minn. House of Reps., 88th Sess., Comm. on Elecs., Recording of Tenth Meeting (Feb. 19, 2013), https://www.house.leg.state.mn.us/Committees/minutes/88008/4843.   Two other States provide for postponing a congressional election in November if a candidate dies and other criteria are met; those laws call for a new election in December. *See* Iowa Code § 49.58; S.C. Code Ann. § 7-11-55.

On the constitutionality of Minn. Stat. § 240B.13, Kistner's argument against preemption proceeds from the two principal judicial decisions in the area. *Busbee v. Smith*, 549 F. Supp. 494 (D.D.C. 1982), *aff'd*, 459 U.S. 1166 (1983), held that where the State of Georgia failed to remedy a violation of the Voting Rights Act of 1965 by the time of a regular November election, the State was not required to conduct certain elections for the House of Representatives on the date specified in 2 U.S.C. § 7.  The court reasoned that "where exigent circumstances arising prior to or on the date established by section 7 preclude holding an election on that date, a state may postpone the election until the earliest practicable date." *Id*. at 525.  Although the

---

[4]Some States provide that if a deceased candidate is replaced on the ballot, then votes already cast for the decedent will be counted as votes for the substituted candidate. *See* Colo. Rev. Stat. § 1-4-1005(4)(b)(II); Fla. Stat. § 100.111(3)(a); 8 N.C. Admin. Code 6B.0104.  One State specifies that if a candidate dies after ballots have been printed, then the name will be crossed off the ballot, and "no votes shall be cast for the candidate."  Idaho Code § 34-912.  Two States direct that votes for a deceased candidate are not to be counted, 17 R.I. Gen. Laws § 17-15-38(a); Va. Code Ann. § 24.2-541, although one permits absentee voters who have cast ballots before a substitution of candidate to receive new ballots and vote again in the affected race. Va. Code Ann. § 24.2-541.

vacancy statute, 2 U.S.C. § 8(a), as originally enacted in 1872, referred to filling a vacancy "if, *upon trial*, there shall be a failure to elect" on the date fixed for election, Act of Feb. 2, 1872, ch. 11, § 4, 17 Stat. 28, 29 (emphasis added), and was revised to use the current language in 1874 without comments by the revisers suggesting a change in meaning, *see* 549 F. Supp. at 525 n.15, the *Busbee* court rejected the view that a "failure to elect" was limited to situations where no candidate obtained the requisite majority of the votes cast on the statutory election date. *Id*. at 526. The court asserted, by way of analogy, that if a natural disaster occurred on the date of a federal election, then "no one would seriously contend that section 7 would prevent a state from rescheduling its congressional elections under such circumstances." *Id*.

Kistner also invokes *Public Citizen, Inc. v. Miller*, 813 F. Supp. 821 (N.D. Ga.), *aff'd*, 992 F.2d 1548 (11th Cir. 1993) (per curiam), which rejected a claim that a run-off election for United States Senate that was held in late November was a nullity because it was conducted on a day other than the earlier Tuesday prescribed by § 7. The court ruled that the State of Georgia legitimately could construe a mere plurality vote on election day as an inconclusive vote that resulted in a "failure to elect" within the meaning of § 8(a). The court reasoned that "[a] state's decision to interpret a plurality result as being inconclusive is not itself unconstitutional," *id*. at 830, and concluded that § 8 "does permit states to prescribe different times for elections when they experience a legitimate failure to elect due to exigent circumstances after making an honest attempt to do so." *Id*. at 831. The decision did not specifically characterize the run-off election as one to "fill a vacancy" within the meaning of § 8(a), but approved Georgia's definition of the time for holding the election as "continuing" through the run-off election in late November. *Id*. at 830.

Kistner gleans two propositions from these decisions. First, the phrase "failure to elect" in § 8(a) is not limited to situations where no candidate obtains the requisite majority vote on election day, and it is broad enough to encompass an outright cancellation or postponement of an election as in *Busbee*. Second, a "failure to elect"

-7-

may result from a policy choice of a State, as with Georgia's refusal to accept a plurality vote as conclusive in *Public Citizen*, even where other States would make a different policy choice and declare a successful election. Taking the propositions together, Kistner asserts that Minnesota's policy choice not to certify the vote totals for Representative from the November 3 election, due to the death of a "major" party candidate, creates a legitimate "failure to elect" under § 8(a) and allows the State to fill the resulting vacancy in a special election.

We need not decide whether to endorse all of what *Busbee* and *Public Citizen* say about 2 U.S.C. §§ 7 and 8.[5] It is an open question whether a State may refuse to certify results of an election for United States Representative based on a natural disaster, death of a candidate, or other event beyond the State's control. Perhaps this is an area where additional federal legislation would be necessary to authorize postponement of a congressional election in certain extraordinary situations.

But assuming the correctness of *Busbee* and *Public Citizen* for the sake of analysis, we still must address whether Minnesota's particular policy choice in § 204B.13 is sufficient to justify declaring a legitimate "failure to elect" under § 8(a) that would allow the State to "fill a vacancy" in the office of Representative. Section 7 establishes a uniform date for federal elections. There are strong federal policy reasons for this uniformity, including to ensure that some States who vote earlier cannot influence voters in other States, and to avoid a burden on citizens who would

---

[5]The *Busbee* decision was summarily affirmed by the Supreme Court, but this means only that the judgment was affirmed, and "the rationale of the affirmance may not be gleaned solely from the opinion below." *Comptroller of Treasury of Md. v. Wynne*, 135 S. Ct. 1787, 1801 (2015) (internal quotation omitted). *Busbee* included a separate holding based on "the primacy of the Voting Rights Act" that arguably was an independent ground for decision that could have supported the affirmance. *See* 549 F. Supp. at 524 ("We hold, in short, that a court's duty under section 5 of the Voting Rights Act to disapprove changes in voting procedures that discriminate in purpose or effect is unaltered by any supposed conflict with 2 U.S.C. § 7.").

be forced to turn out on two different election days. *See Foster*, 522 U.S. at 73-74; Cong. Globe, 42d Cong., 2d Sess. 141 (1871) (remarks of Rep. Butler). If federal law permits a State to cancel an election for Representative based on events beyond the State's control, then we believe the reasons for cancellation would have to be compelling or akin to "exigent circumstances," as *Busbee* and *Public Citizen* suggest.

Applying this demanding standard, we do not think Kistner is likely to succeed on the merits of his contention that § 204B.13, as applied to the current situation, may coexist with the federal election laws. *See Gonzalez v. Arizona*, 677 F.3d 383, 398 (9th Cir. 2012) (en banc) ("[W]e do not strain to reconcile a state's federal election regulations with those of Congress, but consider whether the state and federal procedures operate harmoniously when read together naturally."), *aff'd sub nom. Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013). If the death of a candidate ever would justify cancellation of an election and declaration of a "failure to elect" under § 8(a), then we think it likely that the candidate must represent a political party with a greater history of electoral strength than the Legal Marijuana Now Party in Minnesota. By analogy to the natural disaster hypothetical favored by Kistner, perhaps a major earthquake or hurricane in the congressional district on election day could justify a cancellation, but a snowstorm could not, even if experience showed that the blizzard was likely to depress turnout by five percent. *See* Brad T. Gomez et al., *The Republicans Should Pray for Rain: Weather, Turnout, and Voting in U.S. Presidential Elections*, 69 J. Politics 649, 656 (2007) ("When measured as deviations from their normal values, rain and snow elicit a negative and statistically significant effect on voter turnout.").

The Minnesota statute itself acknowledges that not every death of a candidate on the ballot would warrant cancellation of an election for Representative. If a candidate of the Green Party, the Independence Party, or the Libertarian Party were to die, then the election would proceed. Minnesota law defines the LMN Party as a "major political party," such that death of the party's candidate nullifies the election,

but that designation by the State does not control the preemption question under federal law.

According to data available to us from the Minnesota Secretary of State, no candidate from the LMN Party has ever won federal or state office in Minnesota. In the 2016 presidential election, the party's candidate won 0.38% of the vote. In 2018, the party's candidates for United States Senator in two separate elections garnered 2.55% and 3.70% of the vote, respectively. The party did not run a candidate for Governor or for United States Representative in seven of the eight congressional districts, including the Second District. The party's candidate for Representative in the Fourth District received 4.19% of the vote. As noted, the LMN candidate for state auditor received 5.28% of the statewide vote, thus barely crossing the five-percent threshold in a down-ballot statewide race and qualifying the party for "major political party" status under state law.[6]

In our judgment, assuming for analysis that 2 U.S.C. §§ 7 and 8(a) would allow a State to cancel an election in some scenarios, the State's justification for deviating from the uniform election date based on the death of candidate Weeks is insufficient to show that Kistner has a substantial likelihood of success on appeal. Even if the death of a Republican or Democratic-Farmer-Labor candidate could qualify as an exigent circumstance that would allow the State to cancel an election and trigger a vacancy in office, we think it unlikely that the rationale would extend to the death of a third-party candidate from a party with the modest electoral strength exhibited to date by the Legal Marijuana Now Party in Minnesota. Voters who wish to show support for the agenda of the LMN Party may still cast a vote for the decedent. But it is unlikely that federal law allows Minnesota to cancel the election on account of

[6]Considering only the Second Congressional District, the vote percentages were similar. The LMN Party candidates for United States Senator in 2018 received 2.47% and 3.53%, respectively, and the candidate for state auditor collected 5.27% of the vote.

candidate Weeks's death and to select a new date in February 2021 to fill a vacancy caused by the cancellation.

Kistner also cites harm arising from the Secretary of State's announcement on September 24 that votes in the election for Representative on November 3 would not be counted. On September 28, however, Craig filed this action; an informed candidate or voter would have been aware then that the status of the election was not resolved. The district court entered its injunction on October 9, and the Secretary of State issued a new statement that voters should continue to vote the Second District race on their ballots. Under Minnesota law, any absentee voter who undervoted between September 24 and October 9 had the right until October 20 to cancel his or her ballot and request a new absentee ballot or vote in person. *See* Minn. Stat. § 203B.121 subds. 2-4; Minn. R. 8210.2600(1); 2020 Minn. Sess. Laws, ch. 77, § 1, subd. 3. The potential that some voters nonetheless forwent a vote for Representative due to the Secretary's interim announcement is not sufficient to justify cancelling the election if federal law otherwise would not permit that step. That a short period of uncertainty affected campaign fundraising and tactical decisions by the candidates also does not justify a stay of the injunction without a likelihood of success on the merits.

For these reasons, the motion for an administrative stay and a stay pending appeal is denied. Kistner's motion to expedite the appeal is granted, and the clerk is directed to establish an expedited briefing schedule.

_____

-11-